# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
|           Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 14-00204-01-CR-W-BP |
| Terry W. Randolph, | ) | |
| | ) | |
|           Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court are the DEFENDANT'S MOTION TO SUPPRESS ANY AND ALL EVIDENCE TAKEN FROM DEFENDANT BY LAW ENFORCEMENT OFFICERS (Doc. #21) and DEFENDANT'S MOTION TO QUASH INDICTMENT AS FACTUALLY INCORRECT (Doc. #22), both filed on July 12, 2015, by defendant Terry W. Randolph ("Randolph"). On September 16, 2015, the undersigned held an evidentiary on Randolph's motion to suppress. Randolph was present and represented by his counsel, Kevin Jamison. The government was represented by Assistant United States Attorney Joseph Marquez. At the evidentiary hearing, testimony was given by Randolph as well as Officer Travis Gillihan with the Independence (Mo.) Police Department. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1-2 | Photographs [house] |
| Gov't. #3-4 | Photograph [inside of truck] |
| Gov't. #5 | Consent to search form |
| Gov't. #6 | Photograph [driveway] |

On the basis of all the evidence adduced at the evidentiary hearing and the legal arguments advanced, the undersigned submits the following proposed findings of facts and conclusions of law as to both the motion to suppress and the motion to quash:

# PROPOSED FINDINGS OF FACT[1]

1. Officer Travis Gillihan is employed with the Independence (Mo.) Police Department. Tr. at 4.

2. On February 22, 2014, Officer Gillihan was working as a patrolman when he was dispatched at 11:08 a.m. to 9930 East 31st Street in Independence. Tr. at 4, 20-21.

3. Two other officers (Sumsted and Flavin) were also sent to the address. Tr. at 5.

4. The police dispatcher reported that a suspected residential burglary was in progress. Tr. at 4.

5. Upon arriving at the scene with the other two officers, Officer Gillihan observed three people walking away from the residence, down the driveway toward where Officer Gillihan had parked his patrol vehicle. Tr. at 4-5, 21-22.

6. The three officers ordered the three individuals in the driveway to get down on the ground for purposes of officer safety. Tr. at 5-6, 22-23, 26.

7. Officer Gillihan placed one of the detained individuals (later-identified as Ms. Denton) in his patrol car. Tr. at 6.

8. Officer Gillihan then went back up the driveway to interview the other two individuals who were being detained by Officers Sumsted and Flavin. Tr. at 6-7.

9. Officer Gillihan learned that the two individuals were a Ms. Berning and Terry Randolph. Tr. at 7.

10. Officer Gillihan then proceeded to pat down Ms. Berning and Randolph, asking them at the same time, if they had any weapons on them. Tr. at 7.

11. Randolph responded that he did not have a weapon on him, but he did "have a gun in [his] truck." Tr. at 7, 23, 26-27, 30.

12. Officer Gillihan asked if the gun was loaded and Randolph said that it was not, but the magazine was loaded. Tr. at 7-8.

---

[1] In making these findings, the Court has been required to make some credibility determinations as they pertain to Officer Gillihan's and Randolph's recounting of their encounter. In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. The Court concludes that, where there were conflicts, Officer Gillihan was a more credible witness.

2

13. Randolph told Officer Gillihan that the gun was in the backseat of the nearby truck and that the truck belonged to him [Randolph]. Tr. at 8.

14. Officer Gillihan asked Randolph whether he was a felon and Randolph answered that he was; but that the felony was so long ago it did not matter. Tr. at 8, 19, 28, 36.

15. According to Randolph, a family friend had conducted a "computer check and determined that [Randolph] was no longer a felon." Tr. at 8-9.

16. Officer Gillihan ran Randolph's name through his dispatch and was informed that Randolph was a convicted felon from Oklahoma. Tr. at 19.

17. Officer Gillihan then proceeded to question all three detainees about their presence at the house and conduct an investigation into the possible burglary. Tr. at 9-10, 36.

18. Inasmuch as Officer Gillihan could not locate the out-of-state owner of the residence, he released the two females. Tr. at 10-11.

19. However, Officer Gillihan continued to hold Randolph so as to investigate further whether he was a felon in possession of a firearm. Tr. at 11.

20. Randolph was advised of his *Miranda* rights. Tr. at 11, 33.

21. Randolph waived his right to remain silent and agreed to speak with Officer Gillihan. Tr. at 11, 33.

22. Randolph consented to a search of his truck and signed the consent to search form. Tr. at 11-12, 17-18, 33-34; Gov't Ex. # 5.

23. Randolph understood the English language, was not impaired, and was told twice that he did not have to consent. Tr. at 11, 17-18, 32.

24. At that point, Officer Gillihan did a cursory search of the truck and located a gun case in the backseat floorboard behind the driver's seat. Tr. at 12, 17; Gov't Ex. #3.

25. Officer Gillihan did not open the gun case, but instead called out crime specialists to recover the property and take fingerprints. Tr. at 12.

26. Officer Gillihan then asked Randolph for consent to search his person, to which Randolph agreed. Tr. at 13.

27. A search of Randolph found a small amount of methamphetamine. Tr. at 13.

28. Randolph was then placed under arrest for possession of a controlled substance. Tr. at 13.

3

29. At that point, Officer Gillihan opened the gun case and observed a firearm. Tr. at 13, 17; Gov't Ex. #4.

## PROPOSED CONCLUSIONS OF LAW

### I. Motion To Suppress

In his motion to suppress, Randolph argues that his initial detention by law enforcement officers was unconstitutional, as was the warrantless search of his vehicle. To be sure, the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, though, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, and pertinent to the issue in this case, in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion –

4

supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id.* at 30, 88 S.Ct. at 1884-85.

However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional analysis, rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behaviors; jurors as fact-finders are permitted to do the same and so are law enforcement officers.

*United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). As such, in evaluating the validity of a *Terry* stop, "the totality of the circumstances – the whole picture" must be considered. *Id.* at 417, 101 S.Ct. at 695.

In this case, viewing the totality of the circumstances, the Court finds that the facts known to the officers at the scene satisfied the test for reasonable suspicion. The officers were dispatched to the residence with information that a suspected residential burglary was in progress and, upon arriving at the scene, the officers observed three people walking away from the residence, down the driveway. These facts certainly would not have justified an arrest of Randolph, but they are sufficient grounds for a prudent law enforcement officer to conclude that

5

criminal activity might be afoot and to initiate some investigation that would include a brief detention of Randolph.

Nonetheless, concluding that the initial stop of Randolph satisfies *Terry* does not end the inquiry. It is well-settled that "[a] *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (*quoting United States v. Johnson,* 592 F.3d 442, 451 (3d Cir. 2010)). Thus, *Terry* creates a dual inquiry whereby a court must examine (1) whether the investigatory stop is lawful at the outset, and (2) whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1879.

To conduct a protective frisk under *Terry,* officers must have specific articulable facts, which, along with rational inferences, support a reasonable suspicion that a suspect is potentially armed and dangerous. *United States v. Binion,* 570 F.3d 1034, 1039 (8th Cir. 2009). Perhaps an argument could be made that Officer Gillihan lacked such a suspicion, but the point is moot because the frisk – at that time – uncovered no contraband. However, when Officer Gillihan asked Randolph prior to the frisk if he had any weapons on him or anything that was going to hurt the officer, Randolph stated "No, but I do have a gun in my truck." Officer Gillihan's question was permitted under the public safety exception. As noted recently by one court:

> [Q]uestions designed to prevent officers from hurting themselves
> during a search of the suspect's person are permitted. This type of
> question is logical and important to permit. While firearms on a
> suspect's person or in close proximity to him can be lunged for and
> used to harm an officer, sharp and bio-hazardous objects pose a
> great risk to officers regardless of any action by the suspect.
> Accordingly, a search of his person and items in close proximity is
> necessary, and a question about what an item on his person

6

> contains is a narrow, practical way of ensuring officer safety
> during the immediate and inevitable search of the item. This is true
> whether the item is the clothes the suspect is wearing or something
> that he is carrying.

*United States v. Hernandez*, 751 F.3d 538, 541 (7th Cir. 2014). *See also United States v. Liddell*, 517 F.3d 1007, 1009, 2008 WL 482410 (8th Cir. 2008) (public safety exception allowed officer properly to ask a handcuffed suspect "Is there anything else in there we need to know about . . . That's gonna hurt us?" before searching a car); *United States v. Webster,* 162 F.3d 308, 332 (5th Cir. 1998) (holding that asking whether the suspect "had any needles in his pockets that could injure them during their pat down" fell within the exception); *United States v. Young,* 58 Fed. Appx. 980, 981 (4th Cir. 2003) (same with regard to the question "Do you have any sharp objects, knives, needles, or guns.").

Moreover, even if an argument could be fashioned that Officer Gillihan was conducting a custodial interrogation of Randolph at the time, Randolph's ensuing response was spontaneous, voluntary, and given without violation of the Fifth Amendment. It is, of course, axiomatic that the Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement
> that the [government] which proposes to convict and punish an
> individual produce the evidence against him by the independent
> labors of its officers, not by the simple, cruel expedient of forcing
> it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

7

> [The Fifth Amendment] does not preclude a witness from testifying <u>voluntarily</u> in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*United States v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977) (*emphasis added*). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

8

As noted, however, even if it could be found that Randolph was being subjected generally to custodial interrogation, the Court finds that Randolph's statement that there was a gun in his truck was a voluntary and spontaneous admission that was not induced by the question posed by Officer Gillihan regarding whether Randolph had any weapons on his person. *Compare Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682 1689 (1980); *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir. 1992). To that end, the Supreme Court has unequivocally held:

> A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings.

*Innis*, 446 U.S. at 299, 100 S.Ct. at 1689. *See also United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) ("*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.") (*quoting United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997)); *United States v. Griffin*, 922 F.2d 1343, 1356-57 (8th Cir. 1990); *United States v. Webster*, 769 F.2d 487, 491-92 (8th Cir. 1985).

After Randolph's spontaneous statement about having a gun in his vehicle, Officer Gillihan testified unequivocally as to his next question to Randolph. "I asked him if he was a felon, and he said that he was." Tr. at 8. There could be no other purpose for this question other than to elicit evidence implicating Randolph as a felon in possession of a firearm. The direct answer given in response to the specific question was clearly incriminating. Moreover, at the time, Randolph was not free to leave. In fact, Officer Gillihan testified that if one of the suspects had attempted to leave, he "probably would have maybe Tased them or chased after them and tackled them." Tr. at 23. Under these facts, this questioning of Randolph should have been

9

preceded by an advisement of *Miranda* rights. Since it was not, Randolph's response must be suppressed as a violation of his Fifth Amendment right to freedom from self-incrimination.

However, that finding does not necessarily mandate suppression of the evidence seized, Randolph's ensuing post-*Miranda* statements, or Randolph's consents to search his truck and person. As per routine police procedure, Officer Gillihan ran Randolph's name through his dispatcher and learned that Randolph had a prior felony and, contrary to Randolph's belief, the felony was neither "too old" nor pardoned. The Court concludes that – given Randolph's earlier spontaneous statement as to the presence of a gun in his truck – Officer Gillihan would have run Randolph's name through dispatch and inevitably discovered Randolph's felony conviction, regardless of the earlier problematic question and incriminating answer as to Randolph's felony status.

> The test for inevitable discovery . . . includes two elements. First, there must be an ongoing line of investigation that is distinct from the impermissible or unlawful technique. . . . Second, there must be a showing of a reasonable probability that the permissible line of investigation would have led to the independent discovery of the evidence.

*United States v. Villalba-Alvarado*, 345 F.3d 1007, 1019 (8th Cir. 2003) (*citing Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501 (1984)).

Furthermore, even setting aside the issue of inevitable discovery, the Court concludes that Randolph's subsequent post-*Miranda* consents to search his vehicle and his person were voluntary and effectively purge the taint of any prior constitutional violation. *Compare United States v. Whisenton*, 765 F.3d 938, 941 (8th Cir. 2014). It is well-established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801 (1991). In broad strokes, consents to search are voluntary if they are "the product of an essentially free and unconstrained choice by its maker . .

10

. rather than a product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48 (1973).

To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his *Miranda* rights prior to consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001). With regard to the environment surrounding consent, courts will examine whether the person who consented:

> (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

In this case, and after making credibility findings of the testimony given at the evidentiary hearing, the Court concludes that Randolph voluntarily consented to the search of his vehicle and, later, his person. Randolph was an adult at the time of the incident who appeared to have basic general intelligence and the ability to comprehend what was being said to him. Randolph was not under the influence of drugs or otherwise impaired. There was no evidence that Randolph was threatened or received any improper promises. Finally, once begun, Randolph never objected to the search of his vehicle or his person. Contraband seized under those circumstances should not be suppressed.

## II. Motion To Quash The Indictment

Randolph was indicted on July 29, 2014, for violating 18 U.S.C. §§ 922, 924. Specifically, the indictment states that Randolph is a felon and was in possession of "a firearm, to wit: a Masterpiece Arms 9 mm machine pistol, model MPA930T-A, bearing Serial Number F6214." Randolph seeks to "quash" the indictment because the weapon found in the search of his vehicle was not a "machine pistol."[2]

Initially, it must be noted that Randolph does not raise a ground for dismissal of an indictment. At this point in the proceedings, the Court must assume that all of the facts set out in the indictment are true and should not consider what the evidence at trial may be. As succinctly noted by another district court:

> A motion to dismiss the indictment is not a device for a summary trial of the evidence. The sole function of this motion is to test the sufficiency of the indictment to charge an offense. The sufficiency of the indictment must be determined from the words of the indictment, and the Court is not free to consider evidence not appearing on the face of the indictment. In ruling on this motion, all well-pleaded facts are taken to be true.

*United States v. Birbragher*, 576 F. Supp. 2d 1000, 1005 (N.D. Iowa 2008) *aff'd,* 603 F.3d 478 (8th Cir. 2010), *and aff'd sub nom. United States v. Kanner*, 603 F.3d 530 (8th Cir. 2010). As bluntly stated by the Eight Circuit, "misstatements or mistakes alone do not justify the dismissal of an indictment which is valid on its face." *United States v. Levine*, 700 F.2d 1176, 1180 (8th Cir. 1983).

The remedy that might be applicable, if any, would be a post-trial argument that a fatal variance between the indictment and the evidence at trial effectuated an unconstitutional constructive amendment of the indictment. It is well-settled that "[a] constructive amendment of

---

[2] According Randolph, "[a] machine pistol is a European term for a submachine gun."

12

an indictment is a direct violation of a defendant's Fifth Amendment right to be charged by a grand jury and is reversible error per se [and] arises when a court admits evidence that modifies the essential elements of the offense charged by the grand jury." *United States v. Harris*, 344 F.3d 803, 804 (8th Cir. 2003). However, such argument, based on Randolph's current allegations, is foreclosed under Eighth Circuit precedent.

In *United States v. McIntosh*, 23 F.3d 1454, 1457 (8th Cir. 1994), following a conviction under 18 U.S.C. § 924, a defendant sought an order of acquittal. The defendant argued that the indictment charged him with using an "Arminius Western Star .357 magnum revolver." *Id*. at 1457. The defendant "argue[d] that since the specific brand listed in the indictment ("Western Star") [did] not exist, he [could not] be found guilty because the government failed to prove an essential element of the offense." *Id*. Both the district court and the Eighth Circuit rejected the argument, with the latter court reasoning:

> A court may ignore independent and unnecessary allegations in an indictment. Allegations in the indictment that are not necessary to establish a violation of a statute are surplusage and may be disregarded if the remaining allegations are sufficient to charge a crime. Section 924(c) requires that the defendant commit a drug trafficking crime and that during and in relation to the commission of that crime the defendant knowingly use or carry a firearm. The references to the manufacturer "Arminius" and to the model "Western Star" were surplusage to the offense of carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Because the specific type of firearm is not an element of the offense which the government must prove, the references to "Arminius" and the "Western Star" model do not invalidate the indictment. Therefore, the district court did not err in overruling [the] motion for acquittal based on the type of firearm used.

*Id.* Accordingly, it is

13

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the DEFENDANT'S MOTION TO SUPPRESS ANY AND ALL EVIDENCE TAKEN FROM DEFENDANT BY LAW ENFORCEMENT OFFICERS (Doc. #21) and **DENYING** the DEFENDANT'S MOTION TO QUASH INDICTMENT AS FACTUALLY INCORRECT (Doc. #22), both filed on July 12, 2015, by defendant Terry W. Randolph.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                            */s/ John T. Maughmer*
                                            **John T. Maughmer
                                         United States Magistrate Judge**